IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| AIMEE M. THORMAN,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION,<br><br>Defendant. | CASE NO. 1:25-cv-115<br><br>MAGISTRATE JUDGE JAMES E. GRIMES JR.<br><br>**MEMORANDUM OPINION AND ORDER** |

Plaintiff Aimee M. Thorman filed a complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying her application for disability insurance benefits. Doc. 1. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The parties consented to my jurisdiction in this case. Doc. 4. Following review, and for the reasons stated below, I affirm the Commissioner's decision.

**Procedural Background**

In May 2022, Thorman filed an application for disability insurance benefits, alleging a disability onset date[1] of September 15, 2015.[2] Tr. 212

---

[1]    "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

[2]    Thorman's opening brief states that she alleged that her initial onset date was May 10, 2016. Doc. 8, at 1 (citing Tr. 192). But she notes that the

(alleging that Thorman stopped working due to conditions on September 15, 2015); *but see* Tr. 192 (alleging that Thorman became unable to work due to her conditions on May 10, 2016). In pertinent part, Thorman alleged that she was disabled and unable to work due to the following impairments: complex regional pain syndrome ("CRPS"),[3] small fiber neuropathy, POTS,[4] post-traumatic stress disorder, anxiety, depression, autoimmune encephalitis, and panic attacks. Tr. 212.

_____

record at various points and the ALJ's decision indicate an onset date of September 15, 2015. *Id.* (citing Tr. 84, 95). Beyond her passing statement, Thorman does not challenge the ALJ's determination, and other statements—including some made by Thorman, *see* Tr. 212—indicating an onset date of September 15, 2015. So she has forfeited any issue, to the extent there could be one, arising out of this discrepancy. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citations omitted).

[3]      "Complex regional pain syndrome (CRPS) is a form of chronic pain that usually affects an arm or a leg. CRPS typically develops after an injury, a surgery, a stroke or a heart attack. The pain is out of proportion to the severity of the initial injury." *Complex Regional Pain Syndrome*, Mayo Clinic Diseases & Conditions, https://www.mayoclinic.org/diseases-conditions/crps-complex-regional-pain-syndrome/symptoms-causes/syc-20371151 [https://perma.cc/R8PQ-9KMG].

[4]      "Postural orthostatic tachycardia syndrome (POTS) is a condition that causes a number of symptoms when you transition from lying down to standing up, such as a fast heart rate, dizziness and fatigue. While there's no cure, several treatments and lifestyle changes can help manage the symptoms of POTS." Postural Orthostatic Tachycardia Syndrome, Cleveland Clinic Health Library, https://my.clevelandclinic.org/health/diseases/16560-postural-orthostatic-tachycardia-syndrome-pots [https://perma.cc/P4Y8-XSMV].

In April 2023, Thorman requested a hearing. Tr. 119. Administrative Law Judge ("ALJ") Catherine Ma held a telephone hearing in October 2023. Tr. 47. Thorman appeared, testified, and was represented by counsel at the October 2023 hearing. Tr. 47. Qualified vocational expert Allison Reno also testified. *Id*. In January 2024, the ALJ issued a written decision, which found that Thorman was not entitled to benefits. Tr. 7–26.

In January 2024, Thorman appealed the ALJ's decision to the Appeals Counsel. Tr. 185. In November 2024, the Appeals Counsel denied Thorman's appeal, making the ALJ's January 2024 decision the final decision of the Commissioner. Tr. 1; *see* 20 C.F.R. § 404.981.

Thorman timely filed this action in January 2025. Doc. 1. In her opening brief, Thorman raises two issues:

1.   Whether the ALJ erred in failing to assess plaintiff's complex regional pain syndrome under the provisions of social security ruling 03-2P, which provides the protocol for evaluating claims involving complex regional pain syndrome.

2.   Whether the ALJ erred in that he failed to properly analyze plaintiff's pain in accordance with Social Security Ruling 16-3P.

Doc. 8, at 1.

**Evidence**

*Personal, Educational, and Vocational Evidence*

Thorman was born in 1973 making her 46 years old on the date last insured. Tr. 192. Thorman testified that she completed a bachelor's degree English and described receiving software training. Tr. 55.

*Medical Evidence[5]*

The ALJ's uncontested summary of the medical evidence is as follows:

> Around the time of the September 15, 2015 alleged onset date, the claimant visited the Cleveland Clinic on October 22, 2015 for a physical examination and reported that she exercised regularly and tried to eat healthily (Ex. 9F at 691). The claimant's review of symptoms was negative for back pain, joint pain, swelling, or a mood disorder, she reported experiencing right buttocks pain that was worse with running and sitting and improved with standing, and she reported receiving two injections for this, which helped (Ex. 9F at 692). Upon examination, the claimant was well appearing, alert, and in no acute distress with no pain to palpation over the spine, normal motor findings, negative straight leg raising, and normal range of motion of her lumbar spine, she was able to walk on her heels and tip-toes, her abdominal examination was normal, her extremities were normal, her gait was normal, and her muscular strength was intact and equal in her bilateral upper and lower extremities (Ex. 9F at 693). Muhammad Ali Syed, M.D. assessed the claimant with right sciatica, prescribed a Medrol dose pack, gave the claimant back exercises, and recommended regular aerobic exercise (Ex. 9F at 693).

---

[5]    While the parties cite some different or additional medical records in their briefing, they do not challenge the ALJ's summary of the medical records. Additionally, Thorman does not claim that the ALJ erred in her recitation of the medical evidence. Instead, as is explained below, her challenges generally amount to a dispute over the ALJ's weighing of evidence.

4

On December 4, 2015, the claimant returned to the Cleveland Clinic to follow up on complaints of buttock pain and reported that she was an active runner who started experiencing this pain in August 2015 after increasing her speed while running on the treadmill (Ex. 9F at 687). The claimant also reported a history of lower back pain since she fractured her spine in December 2013, and Michael Schaefer, M.D. noted that an April 2014 MRI of the claimant's lumbar spine showed that her fractures had healed with no stenosis or significant disc issues (Ex. 9F at 687). Dr. Schaefer observed that the claimant was in no acute distress with full range of motion of her lumbar spine, negative facet loading, negative sacroiliac joint maneuvers, mildly positive straight leg raising, right hip tenderness, loss of sensation over her right anterior/lateral leg, mild weakness in her hamstring, and trace weakness in her right ankle dorsiflexion, and her strength, bulk, and tone was otherwise normal in her lower limbs bilaterally (Ex. 9F at 688). Dr. Schaefer noted that the claimant's pain had "much improved" with two PRP injections but then recurred, noted that the claimant had a history of a compression fracture from a fall in December 2013, wondered if her sciatica was a result of a sciatic scar or fibrosis, ordered an MRI of the claimant's right thigh and femur, and prescribed Lyrica (Ex. 9F at 688).

A December 29, 2015 MRI of the claimant's right thigh showed a normal femur and normal muscles, fascia, and subcutaneous tissues (Ex. 9F at 1330-1331). The claimant also received treatment at Chagrin Valley Chiropractic and Acupuncture in December 2019 (Ex. 13F at 1-27).

On January 19, 2016, the claimant was discharged from Cleveland Clinic Rehabilitation and Sports Therapy due to the claimant not following up as recommended, as she had not returned for physical therapy since February 2015 after attending two physical therapy sessions (Ex. 9F at 680-681). The claimant returned to Dr. Schaefer on January 22,

5

2016, reported experiencing severe pain when trying to run, and reported that her previous treatment for this had included "extensive" physical therapy (Ex. 9F at 678-679). The claimant also reported that she had stopped taking Lyrica (Ex. 9F at 680). Dr. Schaefer recommended right piriformis and sciatic nerve block injection, which the claimant underwent on February 2, 2016, discussed future treatment options that included epidural steroid injection, and advised the claimant to try physical therapy again (Ex. 9F at 676-678, 680).

When the claimant followed up at the Cleveland Clinic on March 10, 2016, she reported that her pain had worsened for two weeks after her injection and then returned to pre-injection levels, and she reported that her tizanidine was helping her pain (Ex. 9F at 673). The claimant's gait was non-antalgic, her strength was full in her lower extremities, and straight leg raising was negative (Ex. 9F at 673). Spine medicine fellow Colin Carpenter, M.D. advised the claimant to follow up with neurology for further evaluation of her complaints of lower extremity radiation of pain and advised her to return in three to four months for gradual return to therapy and jogging (Ex. 9F at 674).

The claimant visited general neurology at the Cleveland Clinic on April 4, 2016 and reported experiencing right leg pain (Ex. 9F at 667). Upon examination, the claimant was well appearing, alert, and in no acute distress, her gait examination was normal, her strength was normal, and she had limitation of movement due to pain (Ex. 9F at 670). Neurologist Roya Vakili, M.D. ordered further testing and prescribed the antidepressant and nerve pain medication Vivactil (protriptyline) (Ex. 9F at 667). When the claimant followed up with Dr. Vakili on June 8, 2016, the claimant reported that her pain medication was helping, and her pain had decreased to a level of five out of ten (Ex. 9F at 655). The claimant's gait examination remained normal, her strength was normal on examination, and she had

6

limitation of movement due to pain (Ex. 9F at 657). Dr. Vakili concluded that the claimant's right leg pain was likely due to small fiber neuropathy, increased the claimant's dosage of Pamelor, continued her on Ultram, and referred her to a pain psychologist (Ex. 9F at 655).

On July 3, 2016, the claimant visited the emergency room with a complaint of back pain after falling in the bathroom the night previously and reported that she had a history of back fractures (Ex. 9F at 650). The claimant was ambulatory and denied any leg weakness (Ex. 9F at 650). The claimant had no acute findings on a CT scan of her lumbar spine and sacrum, and this testing showed a stable remote 20 percent compression fracture of the L1 superior endplate (Ex. 9F at 653). The claimant was discharged with pain medication and advised to follow up with her primary care provider in one or two days (Ex. 9F at 653).

About a month later, the claimant returned to Dr. Vakili on August 8, 2016 and reported that Pamelor, Ultram, and tizanidine continued to help her pain (Ex. 9F at 644). The claimant's gait and station remained normal on examination, and Dr. Vakili increased her dosage of Pamelor, discontinued Tramadol, provided a short prescription for Tylenol No. 3, which the claimant reported had previously been helpful, and discussed relaxation techniques (Ex. 9F at 644, 646).

The claimant subsequently visited psychologist Kelly Huffman, Ph.D. on November 29, 2016 for a pain medicine evaluation (Ex. 9F at 636). The claimant reported that her current pain was at a level of five out of ten in severity, described this as "manageable," and reported that stress exacerbated her pain and medication and exercise mitigated it (Ex. 9F at 636). The claimant also reported that she "silver smithed" and made jewelry, she reported volunteering for an achievement center for children as well as for Meals on Wheels, and she reported that she was not depressed and she was doing

7

"pretty well" (Ex. 9F at 637, 639). Dr. Huffman observed that the claimant was cooperative with good eye contact, a euthymic affect, normal speech, logical and relevant thoughts, normal attention span and concentration, and good insight and judgment and pain behavior was not present, and she discussed chronic pain and its management with the claiant, noted that the claimant's prognosis was good, and made no further follow up plan with the claimant (Ex. 9F at 639).

When the claimant followed up with Dr. Vakili on December 22, 2016, the claimant's gait and strength remained normal, and Dr. Vakili continued her medications, discussed healthy lifestyle, exercise, and diet, and advised her to follow up in six months (Ex. 9F at 631, 634).

In January 2017, the claimant reported recently driving back from a trip to Washington, D.C., and upon examination, her gait and reflexes were normal (Ex. 9F at 611-612, 626). In May 2017, the claimant began acupuncture for right leg and foot pain (Ex. 9F at 606). Dr. Vakili referred the claiant to pain management at the Cleveland Clinic, and the claimant visited pain management physician Riad Laham, M.D. on June 19, 2017 and reported experiencing right leg pain without relief from acupuncture (Ex. 9F at 594). The claimant was alert, well-appearing, and in no acute distress upon examination, she had no pain to palpation of the lumbar spine and good range of motion of her back without reproducible pain, straight leg raising was negative bilaterally, she had dysesthesia and allodynia throughout her right lower extremity without any dermatomal distribution, her motor strength and tone were full at a level of five out of five throughout, her sensation was intact to light touch all throughout, and her gait was normal (Ex. 9F at 596). Dr. Laham assessed the claiant with complex regional pain syndrome of the right lower extremity, prescribed Nucynta, a trial of one lumbar epidural steroid injection, and a trial of ketamine infusion for a couple days, continued her on Tegretol,

8

Zanaflex, and nortriptyline, discontinued hydrocodone, and noted that a spinal cord stimulator and Belbuca could be further treatment options (Ex. 9F at 596).

Dr. Vakili subsequently observed in July 2017 that the claimant's gait and strength remained normal on examination (Ex. 9F at 590). The claimant underwent lumbar epidural steroid injection at L4-L5 on July 12, 2017 (Ex. 9F at 586), and she reported no improvement with this when she returned to Dr. Laham on July 25, 2017 (Ex. 9F at 578). The claimant also reported that Nucynta was helpful initially but then this effect gradually faded (Ex. 9F at 578). Dr. Laham observed that the claimant's gait was normal, her sensation was intact, and her motor strength was full at a level of five out of five, and he continued her on Nucynta, prescribed Baclofen, and scheduled the claimant for ketamine infusions (Ex. 9F at 573, 580). When the claimant returned to Dr. Laham on August 29, 2017 after completing a series of five ketamine infusions, she reported 30 to 40 percent improvement and reported that her daily activities and sleep had improved (Ex. 9F at 545). The claimant's gait, strength, and sensation remained normal, and Dr. Laham continued her on Nucynta and gabapentin, prescribed Gralise, and noted that the claimant could repeat ketamine infusion every couple months if needed (Ex. 9F at 547).

The claimant followed up with Dr. Laham in October 2017 and reported 50 percent improvement with ketamine infusion with continued improvement in her daily activities and sleep (Ex. 9F at 524). Her gait, strength, and sensation remained normal, and Dr. Laham continued the claimant on Nucynta and tizanidine and noted that the claimant could schedule additional ketamine therapy whenever she decided (Ex. 9F at 526-527). The claimant resumed ketamine infusions with a series of three additional infusions in December 2017 (Ex. 9F at 508, 517).

The claimant reported ten percent improvement with these additional infusions when she followed up with Dr. Laham on January 2, 2018 (Ex. 9F at 503). Her gait, strength, and sensation remained normal, and Dr. Laham continued her on tizanidine and Nucynta in addition to a compounded topical medication (Ex. 9F at 506) and prescribed methadone later in January 2018 (Ex 9F at 499-500).

On February 12, 2018, the claimant returned to Dr. Vakili and reported that she had weaned herself of methadone because she preferred not to take narcotic pain medication (Ex. 9Fat 493). Dr. Vakili observed that the claimant's gait and strength remained normal, switched her from Pamelor to Cymbalta (duloxetine), increased her dosage of Tegretol, gave her a Toradol injection, and ordered x-rays of her back (Ex. 9F at 493, 496), which showed a stable and mild remote compression deformity of L1 with otherwise maintained vertebral body heights and maintained disc spaces (Ex. 9F at 1274-1275).

About six months later, the claimant visited Philip Fischer, M.D. at Psych BC, where she had last been seen seven years previously, for an initial assessment on August 21, 2018 (Ex. 3F at 3). The claimant reported symptoms of depression, anxiety, and PTSD and reported experiencing family stressors that were causing some of her symptoms (Ex. 3F at 3). The claimant made appropriate eye contact, her gait was normal, and she was well groomed, attentive, friendly, and tearful with an anxious mood, an appropriate affect, no evidence of psychosis, good memory, above average intelligence, good language and fund of knowledge, and good insight and judgment (Ex. 3F at 3-4). Dr. Fischer assessed the claimant with bipolar disorder, PTSD, and ADHD and prescribed duloxetine, alprazolam, and Ritalin (Ex. 3F at 5).

When the claimant followed up with Dr. Fischer on October 16, 2018, she reported that she was under a

lot of stress, including family and financial stressors (Exs. 3F at 9, 4F at 4). The claimant reported no anxiety attacks (Ex. 3F at 11). The claimant was neatly and appropriately dressed and groomed, her gait, speech, insight, and judgment were good, her memory and fund of knowledge were intact, her mood was sad and anxious, and her behavior was within normal limits (Ex. 3F at 16-19). Dr. Fischer concluded that the claimant's depression, complex regional pain syndrome, and PTSD were stable, and he continued the claimant on duloxetine, methylphenidate, and psychotherapy (Ex. 3F at 25-27).

The claimant visited Shaker Women's Wellness for chiropractic treatment of lower back pain and right leg pain in February, March, and April 2019 (Ex. 2F), and she reported that her pain level was increased to a level of seven out of ten and her baseline pain level was usually at a level of three out of ten on February 4, 2019 (Ex. 2F at 12). The claimant also returned to Dr. Fischer in February 2019 and reported that she was feeling "pretty good" despite persistent pain (Exs. 3F at 32. 4F at 26). Dr. Fischer concluded that the claimant's depression was stable, her complex regional pain syndrome had improved with Cymbalta, and her PTSD was improving with psychotherapy, and he continued her on methylphenidate (Ex. 3F at 33). The claimant reported improvement with chiropractic treatment by March 2019 and reported that she had been doing "a lot of kettlebell exercises" (Ex. 2F at 4).

On March 4, 2019, the claimant visited Lindsey Szarka, A.P.R.N. at the Cleveland Clinic and reported that she was generally feeling "pretty good" despite family stressors, she was exercising regularly, and she had right lower abdominal pain (Ex. 9F at 477). Nurse Szarka observed that the claimant was alert and oriented with a normal gait, normal reflexes, right lower extremity pain, and a possible right groin inguinal hernia on examination (Ex. 9F at 480).

11

The claimant subsequently visited the emergency room on March 13, 2019 with complaints of right lower quadrant pain that began in late January, 2019 after she had been "working out" (Ex. 9F at 467). The claimant's abdomen was soft and tender with no rigidity, rebound, or guarding, and a CT scan showed a small fat-containing umbilical hernia (Ex. 9F at 470-471). The claimant was assessed with an umbilical hernia without obstruction or gangrene, discharged later that day in stable condition, and advised to follow up with general surgery and her primary care provider (Ex. 9F at 471).

On March 20, 2019, the claimant visited orthopedic surgeon Atul Kamath, M.D. for an orthopedic consultation and reported experiencing three months of acute right hip pain (Ex. 9F at 462). The claimant reported no use of an assistive device and reported taking over-the-counter pain medication, and she reported that she worked as a stay-at-home mother and had three children with one in college (Ex. 9F at 462, 464). Dr. Kamath observed that the claimant was well appearing, alert, and in no acute distress with a broad and appropriate mood and affect, a stable gait with no assistance, negative Trendelenburg sign, hip tenderness and pain with range of motion, normal range of motion upon knee exam without pain, normal range of motion of her lumbar spine, and negative straight leg raising bilaterally (Ex. 9F at 465). Dr. Kamath ordered additional testing, gave the claimant a right hip injection, and prescribed physical therapy (Ex. 9F at 466).

When the claimant followed up with Dr. Fischer in April 22, 2019, she reported that things had been difficult because her mother had been diagnosed with stage four liver cancer and she was her mother's caregiver (Ex. 3F at 35). Dr. Fischer noted that the claimant remained stable and improved with medication and therapy, and he prescribed Adderall, zolpidem, and Adderall (Ex. 3F at 36).

The claimant visited general surgeon James A. Maglieri, M.D. on May 29, 2019 for a consultation regarding her umbilical hernia (Ex. 9F at 459). Dr. Maglieri observed that the claimant's abdomen was soft and non-tender with normal bowel sounds and a small reducible umbilical hernia (Ex. 9F at 461). Dr. Maglieri concluded that there was no evidence of right lower quadrant pathology to correspond to the claimant's reports of intermittent pain and did not recommend repair of the umbilical hernia because it was "asymptomatic and small" (Ex. 9F at 461).

In June 2019, the claimant followed up with Dr. Fischer and reported that her mother had passed away and she felt traumatized by taking care of her (Ex. 3F at 38). Dr. Fischer observed that the claimant was neatly and appropriately dressed and groomed, her gait, speech, insight, and judgment were good, her memory and fund of knowledge were intact, her mood was sad and anxious, and her behavior was within normal limits (Ex. 3F at 39). Dr. Fischer concluded that the claimant was stable and improving and continued her medications (Ex. 3F at 39).

On July 15, 2019, the claimant followed up with Nurse Szarka and reported that she was under a lot of stress, her mother had passed away from colon cancer, and her father had had a stroke (Ex. 9F at 453). The claiant also reported that she was down to 30 mg of Cymbalta and trying to get off this medication, she was exercising daily for an hour, she was able to do water exercise and the elliptical, and she was unable to run (Ex. 9F at 453). The claimant also denied any anxiety or depression (Ex. 9F at 454). The claimant was alert and oriented with a normal gait and normal range of her lumbar spine upon examination (Ex. 9F at 454).

On September 4, 2019, Stephen Samples, M.D. observed that the claimant was cogent with good fund of knowledge, grossly intact sensation, full strength at a level of five out of five in her upper and lower extremities, and a normal gait, and she was

13

able to walk on her heels and toes and tandem walk
(Ex. 9F at 442). After the September 30, 2019 date
last insured, Dr. Fischer continued the claimant's
medications in November 2019 and noted that the
claimant remained stable and improving (Exs. 3F at
43, 4F at 38).

Tr. 16–22.

**ALJ Decision**

The ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status
   requirements of the Social Security Act on
   September 20, 2019.

2. The claimant did not engage in substantial
   gainful activity during the period from her
   alleged onset date of September 15, 2015
   through her date last insured of September
   30, 2019 (20 CFR 404.1571 *et seq*.).

3. Through the date last insured, the claimant
   had the following severe impairments:
   disorders of the skeletal spine; hernias; small
   fiber sensory neuropathy; complex regional
   pain syndrome; depressive, bipolar, and
   related disorders; attention-
   deficit/hyperactivity disorder (ADHD); and
   trauma and stressor-related disorders (20
   CFR 404.152(c)).

4. Through he date last insured, the claimant
   did not have an impairment or combination of
   impairments that met or medically equaled
   the severity of one of the listed impairments
   in 20 CFR Part 404, Subpart P, Appendix 1
   (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire
   record, I find that, through the date last
   insured, the claimant had the residual
   functional capacity to perform light work as
   defined in 20 CFR 404.1567(b) but with the

14

following additional limitations. She could frequently climb rams and stairs, occasionally climb ladders, ropes, and scaffolds, frequently stoop, kneel, and couch, and occasionally crawl. She was limited to performing simple and routine tasks with occasional interactions with supervisors, coworkers, and the public, and she was limited to occasional routine workplace changes.

6.   Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.   The claimant was born February 20, 1973 (Ex. 2D) and was 46 years old, which is defined as a younger individual age 18–49, on the date last insured (20 CFR 404.1563).

8.   The claimant has at least a high school education (Ex. 2E) (20 CFR 404.1564).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Par 404, Subpart P, Appendix 2).

10.  Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

11.  The clamant was not under a disability, as defined in the Social Security Act, at any time from September 15, 2015, the alleged onset date, through September 30, 2019, the date last insured (20 CFR 414.1520(g)).

*See* Tr. 7–26.

15

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work

> experience? If so, the claimant is not disabled.
> If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id.* "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of Review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* at 103 (citations omitted). The Commissioner's "findings … as to any fact if supported by

17

substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

*Thorman's first issue*

Thorman's first argument is that the ALJ failed to properly consider the impairment of CPRS under Social Security Ruling 03-2p, 2003 WL 22399117 (SSA Oct. 20, 2003), which explains how that condition should be evaluated. *See* Doc. 8, at 23. At the outset, Thorman's assertion the ALJ should have "at least [made] a passing reference" to Ruling 03-2p, and that her failure to do so was an error, *see id.*, is unfounded. Thorman cites no authority requiring the ALJ to specifically cite that ruling when performing analysis under it. So things are not off to a strong start. Thorman's remaining arguments, discussed

next, allege various instances in which she believes the ALJ improperly applied Ruling 03-2p. For the reasons stated, those arguments are also meritless.

Under Ruling 03-2p, "because a finding that [CRPS] is a medically determinable impairment requires the presence of chronic pain and one or more clinically documented signs in the affected region, the adjudicator can reliably find that pain is an expected symptom in this disorder." 2003 WL 22399117, at *6. "Other symptoms, including such things as extreme sensitivity to touch or pressure, or abnormal sensations of heat or cold, can also be associated with this disorder." *Id*. Once CRPS is established as a medically determinable impairment, the ALJ "must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." *Id*. at *6. Additionally, "whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the ALJ is directed to make a credibility finding by looking to the entirety of the record, including:

> medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.

19

*Id.* at *6. The Ruling provides that in crafting an RFC, "all of the individual's symptoms must be considered in deciding how such symptoms may affect functional capacities. Careful consideration must be given to the effects of pain and its treatment on an individual's capacity to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." *Id.* at *7.

In support of her argument that the ALJ failed to properly apply Ruling 03-2p, Thorman highlights certain evidence that she feels the ALJ either improperly emphasized or ignored. For example, Thorman takes issue with the ALJ's discussion of her normal gait and strength and asserts her unsupported opinion that CRPS "causes pain, not loss of strength." Doc. 8, at 25. She further argues that the ALJ emphasized exam findings of "normal gait and strength" and claims that these findings "tell us nothing about the extent to which pain interferes with [Thorman's] activities." *Id.* She also claims that the ALJ's discussion of Thorman's ability to engage in activities of daily living "pick[ed] out certain facts but ignor[ed] [her] testimony[.]" *Id.* Thorman then asserts that the "ALJ's emphasis on [her] running and exercising as being a reason to doubt the severity of symptoms is misleading" and provides an alternative selection of instances from the record in which she described, either to her medical providers or during testimony, difficulty with certain forms of exercise. *Id.* Thorman additionally states that the fact she exercised amounts to a "heads I win, tails you lose" situation because exercise is part of the treatment

20

recognized for CRPS. *Id.* at 25–26. Lastly, Thorman avers that the ALJ's summary of her daily activities did not address her ability to sustain those activities. *Id.* at 27–28.

For starters, Thorman cites nothing to support the idea that the ALJ's consideration of this variety of evidence shows that she failed to comply with Ruling 03-2p. She also does not point to any aspect of Ruling 03-2p that the ALJ improperly applied. Instead, Thorman appears to dispute the weight the ALJ placed on certain evidence and urges the Court to consider anew specific evidence that she views as supporting a different outcome. *See* Doc. 8, at 25 (claiming that the ALJ's identification of her normal gait and strength was a "straw man" and asserting that the ALJ's statements regarding Thorman's capacity to exercise "as being a reason to doubt the severity of her symptoms is misleading" while pointing to medical records indicating periods of time when she was unable to run). Thorman's argument demonstrates that she simply disagrees with the ALJ's evaluation of the evidence. Such disagreement does not support remand because weighing the record evidence is precisely what the ALJ is tasked to do. *See* 20 C.F.R. § 404.1520c(a) (explaining how the ALJ will consider and weigh medical opinions and prior administrative medical findings); *see also Rottman v. Comm'r of Soc. Sec.*, 817 F. App'x 192, 196 (6th Cir. 2020 ("[T]his court does not weigh evidence, assess credibility, or resolve conflicts in testimony—that's the ALJ's job.") (citation omitted)). Relatedly, Thorman's point that exercise was part of her treatment plan is

confusing. *See* Doc. 8, at 26. Nothing in the ALJ's decision contradicts the idea that Thorman engaged in physical activity, at least in part, as a treatment for her pain. In fact, the ALJ recognized that medical providers instructed Thorman to pursue physical therapy and discussed exercise with her. *See e.g.*, Tr. 17–22.

Additionally, to extent that Thorman says that the ALJ ignored evidence, when evaluating her CRPS or otherwise, there is a difference between not citing something and ignoring or failing to consider something. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party") (quoting *Loral Defense Systems–Akron v. NLRB*, 200 F.3d 436, 453 (6th Cir. 1999)). Thorman has not shown that the ALJ failed to *consider* all of the evidence. The ALJ stated that she "consider[ed] the entire record." Tr. 15. Absent evidence to the contrary, the Court will presume that this statement is true. *See NLRB v. Newark Elec. Corp.*, 14 F.4th 152, 163 (2d Cir. 2021); *see also United States v. Chemical Found., Inc.*, 272 U.S. 1, 14–15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."); *cf. Higgs v. Bowen*, 880 F.2d 860, 864 (6th Cir. 1988) (noting that the Appeals Council "state[d] that it 'considered the entire record which was before the administrative law judge, including the testimony at the hearing'").

22

Moreover, not mentioning a specific document or documents, particularly in an over 3400-page record, is not error. *See Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004) ("An ALJ need not discuss every piece of evidence in the record for his decision to stand."); *Byler v. Kijakazi*, No. 5:20-cv-1822, 2022 WL 980099, at *9 (N.D. Ohio Jan. 21, 2022) ("with a nearly one-thousand page record, the ALJ cannot be expected to discuss every piece of evidence that Plaintiff believes is inconsistent with the RFC"), *report and recommendation adopted*, 2022 WL 971384 (N.D. Ohio Mar. 31, 2022).

The record further belies Thorman's claims that the ALJ ignored the specific evidence that Thorman says was ignored. For example, Thorman claims that the ALJ "ignore[d] large portions of [her] testimony as to her daily activities." Doc. 8, at 27. The ALJ didn't ignore Thorman's testimony. And nothing Thorman cites shows that the ALJ failed to consider her ability to sustain certain activities. In fact, the ALJ cited some of the evidence as to sustainability that Thorman highlights in her briefing. *Compare* Doc. 8, at 27 (citing the hearing transcript and summarizing that Thorman would "make dinner, she said, only about two times week, not daily" and "do one load of laundry on two days out of the week"), *with* Tr. 16 (summarizing Thorman's testimony that she would "make dinner twice a week, do a load of laundry twice a week"). So Thorman's blanket assertion that the ALJ failed to consider her testimony regarding sustainability of activities is belied by the ALJ's decision.

Likewise, the ALJ discussed Thorman's testimony regarding her pain. For example, the ALJ summarized that Thorman testified:

> [S]he had severe pain after fracturing her spine, and this pain worsened over time. She tried treatment with a chiropractor, acupuncture, physical therapy, and exercising. She stopped working due to her symptoms in 2015, and she has not been able to work since them. Pain caused her to become depressed and be unable to care for herself like she used to. Pain caused Pain caused her to become depressed and be unable to care for herself the way she used to. She did aquatic therapy, walked on the treadmill, used the elliptical, and did core exercises to strengthen her core. She also did Tai Chi to help with pain. Exercising helped her more than pain medication, and she tried to exercise for 20 minutes a day. She had spine injections, attended physical therapy, and saw a personal trainer. She did not get relief from acupuncture or injections, and chiropractic treatment helped her symptoms.

Tr. 16. The ALJ also detailed the pain Thorman described to her medical providers, along with what those providers did to treat Thorman's pain, when the ALJ summarized the medical evidence. *Id*. at 17–21. After a detailed summary of the medical evidence, the ALJ ultimately found that Thorman "reported significant improvement in her pain treatment over the course of the relevant period, including improvement of her pain with medications to a level [Thorman] described as manageable … with continued improvement in her daily activities and sleep." Tr. 22. The ALJ continued: "[Thorman] engaged in a range of activities of daily living over the course of the relevant period that do not support allegations of disabling symptoms and limitations." *Id*. (citing Thorman's reports and medical evidence showing that during the disability

24

period Thorman made jewelry, worked out, drove to and from Washington, DC, exercised regularly, and began weaning off certain pain medications).

Thorman simultaneously claims that the ALJ ignored evidence while asserting that the myriad of evidence the ALJ did cite was "improperly emphasized." Doc. 8, at 25. But Thorman's dispute over the ALJ's "emphasis" is irrelevant to this Court's evaluation. As explained, it is the ALJ, not Thorman or this Court, who is responsible for weighing the evidence. *See* 20 C.F.R. § 404.1520c(a). And Thorman's citation to additional evidence that she believes supports a different outcome does not demonstrate that the ALJ's decision is not supported by substantial evidence. *See e.g., Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997) ("The decision of an ALJ is not subject to reversal, even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ."). Thorman's citation to other evidence is irrelevant unless she shows that substantial does not support the ALJ's decision. *See Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). At no point in her argument does Thorman argue that the ALJ's decision was not supported by substantial evidence. Instead, she asserts for the first time in her conclusion section that "[s]ubstantial evidence does not support the ALJ's decision that [she] is not disabled[]" and that "the ALJ's denial of disability is premised upon legal error and is unsupported by substantial evidence." Doc. 8, at 30. This conclusory statement—which appears for the first time in her conclusion—

25

does not properly present any argument. *McPherson*, 125 F.3d at 995–96 ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.").

Since Thorman's argument solely contests how the ALJ weighed the evidence, rather than attempting to show that the ALJ's decision was unsupported by substantial evidence, she has not shown that remand is appropriate.

*Thorman's second issue*

In her second issue, Thorman argues that the ALJ failed to evaluate her symptoms of pain as required by Social Security Ruling 16-3p.

Under Ruling 16-3p, to evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must consider medical evidence, the claimant's statements, other information provided by medical sources, and any other relevant evidence in the record. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *4 (Oct. 25, 2017); 20 C.F.R. § 404.1529. Other relevant evidence includes: daily activities; the location, duration, frequency, and intensity of pain or symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication; treatment, other than medication, to relieve pain; any measures used to relieve pain; and "[o]ther factors concerning … functional limitations and restrictions due to pain or

other symptoms." 20 C.F.R. § 404.1529(c). "The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence." *Hatcher v. Berryhill*, No. 1:18-cv-1123, 2019 WL 1382288, at *15 (N.D. Ohio Mar. 27, 2019) (citing *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005)).

The ALJ identified Thorman's medically determinable impairments, Tr. 16, and she then discussed Thorman's symptoms as described in Thorman's testimony and as recorded by her medical providers. *See* Tr. 16–21. Ultimately, the ALJ concluded that Thorman's medically determinable impairments could be expected to cause the alleged symptoms but the "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in the record." Tr. 22.

In her argument, Thorman points to specific portions of the record that she believes show that the ALJ failed to apply Ruling 16-3p. She then makes the conclusory statement that the ALJ "simply fails to do the proper analysis; SSR 16-3p is never mentioned and no pain analysis appears in the decision." Doc. 8, at 29–30. As with her first issue, Thorman fails to cite any authority that required the ALJ to specifically cite Ruling 16-3p. But, more importantly, her statement is inaccurate. The ALJ cited Ruling 16-3p. Tr. 15. Moreover, the

ALJ did conduct a *pain analysis*.[6] The ALJ described the two-step approach imposed by Ruling 16-3p. Tr. 15. The ALJ then applied those two-steps. *See* Tr. 16 (identifying the impairments that limited Thorman before discussing the subjective and objective record evidence); Tr. 22 (explaining that, as required by step one, Thorman's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" and then, as to step two, Thorman's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record"). So the ALJ cited and applied the *pain analysis* required by Ruling 16-3p and Thorman's second argument provides no basis for remand.

**Conclusion**

For the reasons explained above, the Commissioner's decision is affirmed.

IT IS SO ORDERED.

Dated: November 19, 2025                     /s/ James E. Grimes Jr.
                                             James E. Grimes Jr.
                                             U.S. Magistrate Judge

---

[6]     Thorman uses the phrase "pain analysis" but does not explain what she expected that to include. Since this argument pertains to Ruling 16-3p, the Court interprets this statement to mean the two-step inquiry outlined in that ruling.